Dorothy MARZOLF and Lester Marzolf, Plaintiffs,

v.

Alfred GILGORE, D.O. and Alfred Gilgore Medical Associates, P.A., Defendants.

No. 95–2254–DES.

United States District Court, D. Kansas.

July 30, 1996.

Andrew C. Marquardt, Marquardt & Associates, L.L.C., Fairway, KS, for plaintiffs.

James D. Griffin, Betsy G. Kuckelman, Blackwell, Sanders, Matheny, Weary & Lombardi, Overland Park, KS, for defendants.

## MEMORANDUM AND ORDER

SAFFELS, Senior District Judge.

This matter is before the court on defendants' Motion for Summary Judgment (Doc. 36).

### I. FACTUAL BACKGROUND

This case revolves around drug therapy treatment that allegedly caused the plaintiff ("Marzolf") to suffer tardive dyskinesia, an involuntary movement disorder affecting the face and often the extremities such as arms, hands, feet and fingers. Since at least 1977, Marzolf has been treated by several physicians who prescribed drugs in the phenothiazine class (used to treat psychological symptoms).[1] Tardive dyskinesia has been associated with the chronic use of drugs in the phenothiazine class.

On November 3, 1995, defendants ("Gilgore") filed a Motion for Partial Summary Judgment seeking to bar any of Marzolf's claims for acts which occurred prior to June 6, 1991, more than four years before Marzolf filed her cause of action against defendants. On January 19, 1996, Judge Lungstrum entered his Order (Doc. 25) granting partial summary judgment by holding that the four-year statute of repose—Kan.Stat.Ann. § 60–513(c)—bars any of Marzolf's claims for acts which occurred prior to June 6, 1991.

Gilgore began treating Marzolf as a patient on November 26, 1980, and continued to do so until December 1991. For much of that time Gilgore prescribed drugs in the phenothiazine class.[2] The critical dates (for the purpose of the motion before the court) Gilgore treated Marzolf are: August 8, 1991; September 12, 1991; October 11, 1991; and December 23, 1991. The above four dates

---

1. It is unknown how long prior to 1977 Marzolf received a phenothiazine class drug.

2. Dr. Gilgore first prescribed Triavil, a drug in the phenothiazine class, for Marzolf on March 18, 1982, but discontinued it after the first prescription. Dr. Gilgore resumed prescribing Triavil again for Marzolf on December 23, 1983, and continued refilling her prescription each "month to six months" until December 23, 1991.

are the only dates applicable vis-a-vis Marzolf's complaint against Gilgore, due to the operation of the statute of repose, *supra*.

Subsequent to Gilgore's treatment of Marzolf in December 1991, several other physicians prescribed phenothiazine class drugs to Marzolf through October 14, 1994. On March 10, 1995, Marzolf was diagnosed as having tardive dyskinesia.

## II. DISCUSSION

### A. The standard for summary judgment.

■ A court shall render summary judgment upon a showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The rule provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ The substantive law identifies which facts are material. *Id.* at 248, 106 S.Ct. at 2510. A dispute over a material fact is genuine when the evidence is such that a reasonable jury could find for the nonmovant. *Id.* "Only disputes over facts that might properly affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

■ The movant has the initial burden of showing the absence of a genuine issue of material fact. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir.1993). The movant may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The movant need not negate the nonmovant's claim. *Id.* at 323, 106 S.Ct. at 2552–53.

■ Once the movant makes a properly supported motion, the nonmovant must do more than merely show there is some meta-

physical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The nonmovant must go beyond the pleadings and, by affidavits or depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (interpreting Fed.R.Civ.P. 56(e)). Rule 56(c) requires the court to enter summary judgment against a nonmovant who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof. *Id.* at 322, 106 S.Ct. at 2552. Such a complete failure of proof on an essential element of the nonmovant's case renders all other facts immaterial. *Id.* at 323, 106 S.Ct. at 2552–53.

■ The court's function is not to weigh the evidence, but merely to determine whether there is sufficient evidence favoring the nonmovant for a finder of fact to return a verdict in that party's favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11. Essentially, the court performs the threshold inquiry of determining whether a trial is necessary. *Id.* at 250, 106 S.Ct. at 2511.

### B. Whether Gilgore's treatment caused plaintiff's injuries is a question of fact to be decided at trial.

■ According to the plaintiff's expert witness, Dr. Violet B. Matovich, Chief of the Section of Neurology at Truman Medical Center, when a patient uses phenothiazines, the early prescriptions may sensitize the patient so that the patient reacts to later prescriptions by developing a complication from the phenothiazine use. Another way to describe this phenomenon is that early prescriptions of phenothiazines "prime" the patient for later complications.

There can be but little doubt that over the course of some seventeen years, Marzolf received enough phenothiazine class drugs so as to prime herself for later complications. The critical issue is whether Marzolf—at this stage—can make a colorable argument that Gilgore's treatment of her for six months in

1991 is what caused her tardive dyskinesia condition.

Both sides present cogent arguments, but at the summary judgment stage of litigation a court must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence. *See, e.g., United States v. O'Block,* 788 F.2d 1433, 1435 (10th Cir.1986) (stating that "[t]he court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues").

Causation is the "Achilles' heel" of the plaintiff in this litigation.[3] The statute of repose attenuated what appears otherwise to be a formidable causal relationship between years of the plaintiff taking phenothiazine drugs and the development of tardive dyskinesia. Nevertheless, the plaintiff is correct in that "[w]hether conduct in a given case is the cause in fact or proximate cause of plaintiff's injuries is normally a question of fact for the jury." *Baker v. City of Garden City,* 240 Kan. 554, 731 P.2d 278, 281 (1987).

In *Baker,* the Supreme Court of Kansas relied on W. Page Keeton et al., *Prosser and Keeton on Torts* § 41, at 269–70 (5th ed. 1984) to decide what burden of proof was required of the plaintiff on the issue of causation. The pertinent text is as follows:

> The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant. Where the conclusion is not one within common knowledge, expert testimony may provide a sufficient basis for it, but in the absence of such testimony it may not be drawn.... The plaintiff is not, however, required to prove the case beyond a reasonable doubt. The plaintiff

> need not negative entirely the possibility that the defendant's conduct was not a cause, and it is enough to introduce evidence from which reasonable persons may conclude that it is more probable that the event was caused by the defendant than that it was not. The fact of causation is incapable of mathematical proof, since no one can say with absolute certainty what would have occurred if the defendant had acted otherwise. Proof of what we call the relation of cause and effect, that of necessary antecedent and inevitable consequence, can be nothing more than 'the projection of our habit of expecting certain consequences to follow certain antecedents merely because we had observed these sequences on previous occasions.' If as a matter of ordinary experience a particular act or omission might be expected, under the circumstances, to produce a particular result, and that result in fact has followed, the conclusion may be permissible that the causal relation exits."

The evidence in this case demonstrates that one of the side effects of the class of phenothiazine drugs is tardive dyskinesia. Protracted use of such drugs primes a patient for developing tardive dyskinesia. The above-quoted burden of proof requires that—more likely than not—the conduct of the defendant was *a* cause in fact of the result, i.e., injury. It does not require that the plaintiff demonstrate that defendant's conduct was *the* cause in fact of the injury, especially in light of Kansas being a comparative negligence state.

The plaintiff properly relies on an expert to demonstrate causation. That expert, Dr. Violet B. Matovich, is Chief of the Section of Neurology at Truman Medical Center. She evaluates and treats patients with movement disorders, including tardive dyskinesia. The record indicates that Dr. Matovich has completely familiarized herself with the plaintiff's medical history. Her affidavit, which the court finds is *not* a sham, notes that the defendant prescribed Triavil (a phenothiazine drug) continuously for approximately eight

---

**3.** Achilles was the greatest warrior among the Greeks at Troy and the slayer of Hector. He was said to be vulnerable only in the heel. Thus the saying "Achilles' heel," which means "a vulnerable point." Webster's New Collegiate Dictionary 9 (8th ed. 1973).

years. That protracted period of time primed the plaintiff to develop tardive dyskinesia. "Dr. Gilgore's last four treatments of Dorothy Marzolf ... certainly could have, and were more likely than not, to have been the treatments that ultimately caused Dorothy Marzolf, in her already primed condition, to develop this tardive dyskinesia." (Matovich affidavit, p. 2). If Dr. Matovich believes that defendant's treatment of the plaintiff caused her to develop tardive dyskinesia, this court will entertain a complete explanation of how she arrived at her opinion.

Further, since first reviewing the medical history of Marzolf, Dr. Matovich has been critical of the treatment the plaintiff received from the defendants. Her position that the last four treatments by defendants in 1991 more likely than not caused Marzolf's tardive dyskinesia is consistent with her generally negative view of the defendants' overall care of Marzolf. In what appears to be her first report on the treatment of the plaintiff, Dr. Matovich writes:

> During the period of time that Dr. Gilgore administered this potent neuroleptic drug combination to Dorothy Marzolf, there is nothing of record to indicate that the physician made the patient or her husband aware of the potential of developing an irreversible movement disorder. When the patient was questioned in this regard, she states that this was never discussed.

(December 4, 1995, Report of Violet Matovich, M.D., Ex. A, Defendants' Motion for Summary Judgment, p. 2)

Finally, another medical expert, Dr. William C. Koller, M.D., Ph.D., who researches movement disorders, suggests that whether neuroleptic drugs (like Triavil) are taken over a long period of time may not be critical to a person developing tardive dyskinesia:

> Q. (Marquardt) In her case, you would agree that it appears at least that there's a likelihood that her particular movement disorder was caused by a fairly long-term administration of neuroleptic drugs?
>
> A. (Dr. Koller) I'm not so sure the long term is so important, but the fact that they emerged when she was withdrawn from a neuroleptic compound suggests some association.

(Koller depo., Ex. 9, Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment, p. 7). The obvious inference in Koller's statement is that tardive dyskinesia might result from a short-term administration of neuroleptic drugs.

For all of the foregoing reasons, the court finds that this case is not ripe for summary judgment and it must move forward.

**IT IS THEREFORE BY THE COURT ORDERED** that defendants' Motion for Summary Judgment (Doc. 36) is denied.